**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 41779**

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENTAL RIGHTS OF JANE (2014-02) DOE. | ) ) ) | |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) | 2014 Unpublished Opinion No. 465 |
| | ) | Filed: April 21, 2014 |
| Petitioner-Respondent, | ) ) | |
| | ) | Stephen W. Kenyon, Clerk |
| v. | ) ) | |
| | ) | THIS IS AN UNPUBLISHED |
| JANE (2014-02) DOE, | ) ) | OPINION AND SHALL NOT BE CITED AS AUTHORITY |
| Respondent-Appellant. | ) ) | |
| | ) | |

Appeal from the Magistrate Division of the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Carolyn M. Minder, Magistrate.

Decree terminating parental rights, <u>affirmed</u>.

Alan E. Trimming, Ada County Public Defender; Tahja L. Jensen, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Jeffrey P. Dearing, Deputy Attorney General, Boise, for respondent.

_____

LANSING, Judge

Jane Doe (Mother) appeals from the magistrate's decree terminating her parental rights to her most recent child, arguing the magistrate erred by finding neglect. We affirm.

**I.**
**FACTS AND PROCEDURE**

Mother has a significant child protection history. Before the instant Child Protective Act (CPA) proceeding was filed, Mother's parental rights as to her first four children were terminated, in a number of separate proceedings over several years, following allegations of neglect or abuse. On March 24, 2011, Mother's sixth child, a six-week-old infant, was in the hospital suffering from respiratory distress. Mother, wanting to take the child home, argued with

1

health care workers and interfered with the child's treatment. Among other things, Mother physically removed the child's breathing tube to prove her point that the child was fine, causing the child's oxygen level to plummet. The police were called and the child was declared in imminent danger and was taken into protective custody. On March 28, 2011, the Idaho Department of Health and Welfare (Department) filed a CPA case alleging that this child was neglected. During the course of proceedings, Mother's fifth child, a two-year-old, was also declared in imminent danger and taken from Mother's home and into protective custody. It was alleged, among other things, that Mother's unaddressed mental health problems, anger management issues, instability in housing, and inability to maintain a sanitary home left her unable to discharge her responsibilities to provide necessary medical care and parental care and control of her children. Both children were placed in foster care and a case plan pertaining to mother was filed.

On January 14, 2012, and while CPA proceedings involving her fifth and sixth children were pending, Mother gave birth to her seventh child (hereinafter "Seventh Child"), who is the subject of the present appeal. The day before the birth, Mother, who had been living in a van, had procured a residence. Despite concerns about the safety and cleanliness of Mother's home, the Department allowed the infant to remain in Mother's home until August 21, 2012, when Seventh Child was removed from Mother's custody and taken into care of the Department because the child was significantly underweight. In the interim, on March 15, 2012, Mother executed a voluntary consent to termination of her parental rights as to her sixth child.

On August 21, 2012, a sixth amended petition for hearing under the CPA was filed to incorporate Seventh Child. Mother waived her right to a shelter care hearing and an order of temporary legal custody in the Department was entered on August 23, 2012. On September 10, 2012, Mother stipulated that Seventh Child came within the jurisdiction of the CPA. On September 14, 2012, the magistrate court entered an order vesting legal custody of Seventh Child with the Department. In response to a September 11, 2012, petition for termination of Mother's parental rights as to her fifth child, on November 8, 2012, Mother stipulated to a default judgment terminating those rights.

In the interim, on October 22, 2012, an updated case plan pertaining to Mother was filed. The case plan assigned tasks to Mother to address her homelessness; safety concerns for her children arising from homelessness; Mother's lack of income; Mother's underfeeding of and

parenting skills as to Seventh Child; visitation with Seventh Child; the children's medical, developmental, and educational needs; and Mother's untreated mental health problems. On November 1, 2012, the magistrate court entered orders approving the case plan and also assigning legal custody of Seventh Child to the Department. Seventh Child was placed in foster care.

The magistrate court held a review hearing in February 2013. In July 2013, the Department filed a petition for a permanency hearing and an eighth amended petition for hearing under the CPA. On July 29, 2013, a permanency review hearing was held. At the hearing, the Department and Seventh Child's guardian ad litem filed reports presenting a non-positive picture of Mother's ability and willingness to address the concerns identified in the case plan. On August 8, 2013, the magistrate court entered an order granting the Department's request to amend the permanency goal to termination of Mother's parental rights and adoption. On September 18, 2013, the Department filed a petition for termination of parent-child relationship, alleging that Mother had neglected Seventh Child and that termination was in the best interests of the child.

At the December 16, 2013, termination trial, a Department social worker supervisor and Seventh Child's guardian ad litem testified concerning Mother's alleged neglect and the best interests of the child. Mother did not testify. Thereafter, the magistrate entered a decree terminating Mother's parental rights.[1] Mother timely appeals and asserts the magistrate court erred in its findings that she neglected Seventh Child.

## II.

## STANDARD OF REVIEW

The United States Supreme Court has held that a parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Quilloin v. Walcott*, 434 U.S. 246, 254-55 (1978), and the CPA directs that "the state of Idaho shall, to the fullest extent possible, seek to preserve, protect, enhance and reunite the family relationship." Idaho Code § 16-1601. Likewise, the Termination of Parent and Child

---

[1] The Department spent some time in the course of proceedings establishing the identity of the fathers to the three children. Ultimately, the three fathers' parental rights to the three children were terminated, and none of the fathers have appealed.

Relationship Act states, "Implicit in this chapter is the philosophy that wherever possible family life should be strengthened and preserved . . . ." I.C. § 16-2001(2).

Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by "clear and convincing evidence." *Santosky*, 455 U.S. at 769. *See also* I.C. § 16-2009; *In re Doe*, 146 Idaho 759, 761-62, 203 P.3d 689, 691-92 (2009); *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). On appeal from a decision terminating parental rights, this Court examines whether the decision is supported by substantial and competent evidence, which means such evidence as a reasonable mind might accept as adequate to support a conclusion. *Doe v. Doe*, 148 Idaho 243, 245, 220 P.3d 1062, 1064 (2009). The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order terminating parental rights. *Id.* at 245-46, 220 P.3d at 1064-65. The Idaho Supreme Court has also stated, however, that the substantial evidence test requires a greater quantum of evidence in cases where the trial court's finding must be supported by clear and convincing evidence, than in cases where a mere preponderance is required. *In re Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. *In re Adoption of Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006). Further, the trial court's decision must be supported by objectively supportable grounds. *Doe*, 143 Idaho at 346, 144 P.3d at 600. In our review of the record, this Court will not set aside a magistrate's findings of fact unless they are clearly erroneous. Idaho Rule of Civil Procedure 52(a); *Doe I v. Doe*, 138 Idaho 893, 906, 71 P.3d 1040, 1053 (2003). Giving due regard to the trial judge's opportunity to assess the credibility of the witnesses, we will liberally construe the trial court's findings of fact in favor of the judgment entered. *Doe I*, 138 Idaho at 906, 71 P.3d at 1053. Even if a finding of fact is in error, this Court should disregard such error unless it affects the substantial rights of the parties. I.R.C.P. 61.

### III.

### ANALYSIS

A.      **The Magistrate's Findings of Neglect Are Supported by Substantial and Competent Evidence**

The magistrate's decision in this case was based upon Idaho Code § 16-2005(1)(b), which provides that a parent-child relationship may be terminated when it is in the child's best

interests and the parent has abused or neglected the child. As alleged in the petition in this case, a "neglected" child is defined in I.C. § 16-1602(26)(a) and (b) as a child:

> (a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them . . . or
>
> (b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being . . . .

A parent's performance under a case plan is relevant to a finding of neglect under Idaho Code § 16-1602(26)(a) and (b). *In re Doe 2009-19*, 150 Idaho 201, 205, 245 P.3d 953, 957 (2010). Additionally, the magistrate may consider both past and current conduct when determining whether grounds exist for terminating a person's parental rights. *State v. Doe*, 144 Idaho 839, 843, 172 P.3d 1114, 1118 (2007); *In re Doe*, 152 Idaho 953, 959, 277 P.3d 400, 406 (Ct. App. 2012).

As to Mother, the petition for termination alleged neglect by conduct or omission, to wit her: "extensive Child Protection history, her unaddressed mental health concerns, her demonstrated lack of parenting ability, her instability in employment and/or lack of appropriate housing." In its memorandum decision and order terminating Mother's parental rights, the magistrate court noted that the Department's assigned caseworker testified that Mother had an extensive history with Child Protection beginning in 1997 and that all of Mother's parental rights to her previous six children had been "voluntarily" terminated by Mother following allegations of abuse or neglect. On appeal, Mother does not contest these basic facts. Instead, Mother complains of the lack of testimonial "specific information" about the neglect or abuse and Mother's "progress" in those cases. Mother also argues that "while information regarding Mother's ability to care for children previously in her care may be considered by the court, it should not be the only thing considered."

A magistrate may consider both past and current conduct when determining whether grounds exist for terminating a person's parental rights. *Doe*, 144 Idaho at 843, 172 P.3d at 1118. Contrary to Mother's assertions, Mother's telling history of abusing or neglecting her children was not the "only thing considered" by the magistrate court in terminating Mother's parental rights. Instead, the magistrate court considered this evidence only to inform its specific findings of neglect in this case and in its best interests of the child determination. The lack of

5

"specific information" at trial concerning Mother's prior neglect or abuse of her children does not mitigate Mother's neglect in this case.

At trial, the caseworker testified about Mother's psychological background. Mother had been diagnosed with a number of conditions, including bipolar disorder and post-traumatic stress disorder (PTSD). The case plan required Mother to undergo a psychological evaluation and the Department made multiple appointments, but Mother failed to show up for any of them. Mother was not taking any medications. From this evidence the magistrate court found that it was undisputed that Mother has unaddressed mental health concerns and that she is "unstable mentally." On appeal, Mother asserts that the magistrate court's finding that she is "unstable mentally" is not based upon substantial and competent evidence because the caseworker said her memory was "dim" on Mother's diagnosis. However, the caseworker affirmatively testified that Mother had been diagnosed with both PTSD and bipolar disorder. To describe a person with an unaddressed medical diagnosis of the type involved here as mentally unstable does not constitute a finding unsupported by the evidence. In addition, the magistrate court was free to consider Mother's conduct and omissions throughout the case plan as evidence of that mental instability. We also note that the lack of more specificity about Mother's mental condition was due in large part to her failure to comply with the case plan requirement that she undergo a psychological evaluation.

The magistrate court found that Mother neglected Seventh Child primarily because Mother lacked parenting ability. There is ample evidence in the record supporting this determination. Based upon the testimony of the caseworker and Seventh Child's guardian ad litem, the magistrate court found that Seventh Child was taken from Mother's custody because of "failure to thrive," specifically because Mother "did not adequately feed" the child. Despite the Department's efforts to educate Mother, she did not grasp that Seventh Child was nutritionally deprived and was suffering as a consequence. The Department referred Mother to a lactose specialist who instructed Mother how to properly breastfeed Seventh Child, but Mother did not follow through or comply with the advice given. The child's nutritional deprivation abated during his sixteen months in foster care.

Also as to parenting ability, the case plan provided that Mother would have twice weekly two-hour visits with Seventh Child while he was in foster care. With respect to this visitation, the magistrate court made the following findings. The court found that the Department made

6

reasonable efforts to assist Mother in complying with her case plan, including providing gas vouchers and bus passes, referrals for all required evaluations, case management, infant toddler referrals, budgeting help, and training including intensive parenting coaching during visits. Nevertheless, within two months of Seventh Child's removal, Mother unilaterally reduced her visits to one-hour visits, twice a week. The next month, Mother unilaterally reduced her visits to a one-hour visit, once a week. By March 2013, Mother was unpredictable on showing up for visits. In the last two months before the termination trial, Mother did not visit Seventh Child at all. Overall, Mother appeared for only half of the scheduled visits, amounting to thirty visits with her infant child in a sixteen-month period. The magistrate court further found that when Mother did visit with Seventh Child, she had a difficult time with bonding and attachment. She would be distracted, would be present but playing on her phone, or would sit on a couch and observe but not interact with the child. Mother did not cooperate with suggestions by Infant Toddler Specialists to work on bonding and attachment. Mother never brought snacks, diapers or anything for Seventh Child when she visited. Mother paid no child support. The case plan required Mother to attend the child's medical appointments, but she attended none. Indeed, the magistrate court found that Mother did not complete *any* of the tasks on her case plan during the sixteen months that Seventh Child had been in foster care. Testimony of the guardian ad litem and the Department caseworker provide support for these findings.

Mother does not dispute any of these findings in this appeal. Instead, Mother contends that she "cared for the child" for the first seven months of the child's life, and this should weigh in her favor. This fact does not negate the findings by the magistrate court to the effect that Mother had no parenting skills and was uninterested in developing those skills, nor does it establish that those findings were not supported by substantial and competent evidence.

Lastly, the case plan called for Mother to be able to provide for her child's basic living needs and suitable housing. The caseworker testified that from the beginning of the case Mother had been unemployed and was relying on approximately $700 in monthly disability benefits, which did not provide for Mother's basic needs, let alone those of Seventh Child. The caseworker further said that until the day before Seventh Child was born Mother was living in a van with her boyfriend, but that Mother secured an apartment in which she lived for thirteen months before she was evicted. Thereafter, the caseworker testified, Mother lived in a motel for three months and thereafter represented that she was splitting her residency between a friend's

home and her mother's home.  The caseworker said, however, that Mother refused to provide the friend's name or address, would not allow the Department to inspect either residence, and refused to provide receipts for rent or utilities paid.  From this evidence the magistrate court found, among other things, that Mother had no job, that she demonstrated an inability and unwillingness to provide for Seventh Child, and that Mother is "unstable . . . financially and housing-wise."

On appeal, Mother complains that "there was no testimony or evidence presented at trial that would allow the magistrate to determine that Mother had instability in employment" and that the testimony established that "Mother's income remained stable."  Beyond the preliminary fact that the magistrate court did not find that "Mother had instability in employment," Mother's argument is a matter of semantics, not substance.  The magistrate court's point was that Mother's established disability benefits "income" was not sufficient to provide for herself and her child, and that Mother had done nothing to fix this shortcoming.  Mother also notes that for thirteen months she did in fact have housing.  Again, this argument misses the point that at the time of termination Mother had no home nor any reasonable prospect of acquiring the same to provide shelter for her child.  Mother has shown no error.

The magistrate court's findings of neglect are supported by substantial and competent evidence.  Accordingly, the magistrate court's decree terminating the parental rights of Mother is affirmed.

Chief Judge GUTIERREZ and Judge MELANSON **CONCUR.**